# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| A.BRUCE CHASHIN, derivatively on behalf of COMMONWEALTH REIT, <br><br> Plaintiff, <br><br> -against- <br><br> REIT MANAGEMENT & RESEARCH LLC, BARRY M. PORTNOY, ADAM D. PORTNOY, JOHN C. POPEO, FREDERICK N. ZEYTOONJIAN, PATRICK F. DONELAN, WILLIAM A. LAMKIN and JOSEPH L. MOREA, <br><br> Defendants. <br><br> -and- <br><br> COMMONWEALTH REIT, <br><br> Nominal Defendant. | Civil Action No.: <br><br><br> **SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> (**DEMAND REFUSED**) <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff alleges the following based upon the investigation of Plaintiff's counsel, which included a review of the Securities and Exchange Commission ("SEC") filings by CommonWealth REIT ("CWR" or the "Company"), as well as filings and reports about the Company, press releases, and other public statements issues by the Company, media reports about the Company, and other lawsuits filed against CWR.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Plaintiff made a demand upon the Board of Trustees ("Board") of CWR by letter dated April 29, 2013.  The demand was made without prejudice to Plaintiff's position that all of the Trustees are/were unable to objectively consider a demand of a shareholder and/or take any action to protect the best interests of CWR or its shareholders with respect to the issues raised in

the April 29, 2013 letter.  The demand was constructively refused by the CWR Board of Trustees through their counsel.

## **NATURE OF THE ACTION**

1.      This is a shareholders' derivative action for claims arising out of injuries to CWR by Defendants' breach (or aiding and abetting thereof) of common law fiduciary duties of candor, care and loyalty under Maryland law.  The loss and damage to CWR is not quantifiable but includes stock dilution, reduction in voting power, elimination of shareholders' rights to hold officers and trustees accountable for engaging in fiduciary breaches, excessive compensation, corporate waste, self-dealing, entrenchment, non arms'-length related party transactions, and failure to maintain adequate disclosure systems and controls resulting in potential liability to CWR in shareholder class action securities fraud lawsuits.

2.      The fiduciary breaches that caused loss and damage to CWR were the acts and omissions of the Company's Board, including the Insider Defendants (*i.e.*, the Portnoys), to attain effective control over the Company despite not owning a majority of the economic value of the Company or majority voting control.  The Defendants had no accountability to CWR due to ultra-vires Declaration of Trust, and the Bylaw provisions which put Defendants beyond the reach of accountability to the Company and shareholders to whom they owe fiduciary duties.

3.      The wrongful conduct was motivated by the conflicting interests of the controlling persons and entities of the Company, *i.e.*, both Portnoy Defendants and their wholly owned management Company Defendant, REIT Management & Research LLC ("RMR"), which has virtual control over the Company through agreements that purport to delegate almost all authority over the Company to RMR.  Those same agreements divest the Company's Trustees of their ability to resolve conflicts of interest between RMR and the Company and, in fact, preclude

the Trustees from protecting the Company from exploitation and self-dealing by the Portnoys and/or RMR.  The few devices at the Board's disposal are futile because the Board members are all dominated by the Portnoys and/or are self-interested and not independent.

4.      The acts and transactions which have harmed shareholders include:

(i)      Severely diluting public shareholders for an improper purpose;

(ii)     virtually eliminating shareholders' voting power;

(iii)    virtually eliminating shareholders' rights to hold management and third parties accountable for fiduciary breaches that harm shareholders;

(iv)     impairing shareholders' legal rights to dividends from the Company;

(v)      entrenching themselves;

(vi)     wasting corporate assets;

(vii)    engaging in self-dealing transactions that have resulted in the transfer of hundreds of millions of dollars of shareholder value from CWR to other entities controlled by the Insider Defendants and have resulted in huge windfall profits to the Portnoys and Defendant RMR at the expense of CWR and its shareholders; and

(viii)   awarding excessive compensation to Board members.

5.      Plaintiff seeks monetary, declaratory, equitable and injunctive relief to compensate CWR for loss and damage and to remedy fiduciary breaches enumerated herein and/or the adverse effects thereof to CWR and its shareholders.

## PARTIES

6.      Plaintiff A. Bruce Chashin as trustee of the Dr. Hila Louise Chashin-Simon Foundation, Inc. is a shareholder of CWR and a citizen of the state of Florida.   The foundation has been a shareholder of CWR since 2010.

7.      Nominal Defendant CWR is a Maryland Real Estate Investment Trust ("REIT") with its principal executive offices located in Newton, Massachusetts.   CWR primarily owns office and industrial buildings located throughout the United States in suburban areas and central business districts of major metropolitan markets.   CWR has no employees.   Rather, it is and was at all relevant times herein managed by Defendant RMR.   Each of CWR's executive officers is also an executive officer of RMR.

a.      As of February 21, 2013, there were 83,804,068 shares outstanding of the Company's common stock.   As of March 15, 2013, there were 118,304,068 shares outstanding of the Company's common stock after a dilutive secondary offering of approximately 34 million shares at a below-market price.   As of August 7, 2013, there were 118,314,068 shares outstanding of the Company's common stock.

b.      On April 12, 2013, the Board amended the Bylaws to restructure its Board into three classes:  Class I, with terms to expire at the 2013 annual shareholder meeting; Class II, with terms to expire at the 2014 annual shareholder meeting; and Class III, with terms to expire at the 2015 annual shareholder meeting.

8.      Defendant RMR is incorporated in Delaware and headquartered in Newton, Massachusetts.   RMR is 100% owned by Defendants Barry M. Portnoy ("B. Portnoy") and his son, Adam D. Portnoy ("A. Portnoy") (collectively, the "Portnoys").   In addition to various other real estate companies, RMR manages CWR and four publicly traded REITs that

were spun-off from CWR with assets from CWR:   (i) Hospitality Properties Trust (NYSE:HPT) ("HPT"); (ii) Senior Housing Properties Trust (NYSE:SNH) ("SNH"); (iii) Government Properties Income Trust (NYSE:GOV) ("GOV"); and (iv) Select Income REIT (NYSE:SIR) ("SIR").   RMR collects management fees from these trusts.   From 2009 through 2012, RMR collected approximately one-half billion dollars in management fees from the Trusts.

9.      Defendant B. Portnoy is a citizen of Massachusetts.   He founded CWR and has served as one of its managing trustees since its formation in 1986.   That same year, B. Portnoy founded Defendant RMR and has served as its Chairman since 1986.   He and his son, Defendant A. Portnoy, collectively own 100% of RMR.   Defendant B. Portnoy is also the founder and a trustee of all of the public REITs managed by RMR.   He has served as the managing trustee of SIR since 2012, of GOV since 2009, of SNH since 1999, and of HPT since 1995.   B. Portnoy is a Class II trustee of CWR.   According to SEC filings, B. Portnoy owns 238,406.73,406 shares of CWR common stock, 4,031.239 shares of SIR common stock, 28,649 shares of GOV common stock, 216,908 shares of SNH common stock, and 326,576 shares of HPT common stock.

10.      Defendant A. Portnoy, son of B. Portnoy, is a citizen of Massachusetts.   He is and has been one of the Company's managing trustees since 2006 and it's President since January 2011.   A. Portnoy also served as CWR's Executive Vice President from 2003 to 2006.   A. Portnoy has been RMR's President and Chief Executive Officer, and a trustee of CWR since 2006.   A. Portnoy is a Class III trustee of CWR.   A. Portnoy has served as a managing trustee of HPT since 2007 and of SNH since 2007.   He has been the Managing Trustee of GOV since 2009 and served as its President from 2009 to 2011.   According to SEC

filings, A. Portnoy owns 40,599.75 shares of CWR, 4,000 shares of SIR, 33,363 shares of GOV, 115,987 shares of SNH, and 84,858 shares of HPT. A. Portnoy is named as a Defendant in his capacity as both an officer and trustee of the Company.

11.    From CWR's inception, RMR and the Portnoys have controlled every operational, investment, and management decision of CWR. All of RMR's officers are officers of CWR. CWR has no independent employees of its own, nor does it have any capability of performing any of the services that it needs to operate on a day-to-day basis. By virtue of their positions as trustees, officers, and managers of CWR, and virtue of their control over and relationship with CWR, Defendants B. Portnoy, A. Portnoy, and RMR stand in a fiduciary relationship to CWR.

12.    Defendant John C. Popeo ("Popeo") has served as the Treasurer and Chief Financial Officer ("CFO") of CWR since 1999, Assistant Secretary of CWR since October 2008, and Secretary of CWR from 1999 to October 2008. Popeo has also been Treasurer and an Executive Vice President of RMR since 1997 and September 2008, respectively. Popeo previously served as a Vice President of RMR from 1999 to 2006 and as a Senior Vice President of RMR from 2006 to September 2008. Popeo has also served as the Treasurer and CFO of SIR since its formation in 2012. Popeo served as Vice President of RMR Advisors (a Portnoy-affiliated entity) from 2004 to November 2009 and has served as Vice President of RMR Real Estate Income Fund and its predecessor funds (also Portnoy-affiliated entities) from shortly after their formations. According to SEC filings, Popeo owns 33,500 shares of CWR and 3,000 shares of SIR. Popeo is a certified public accountant and a citizen of Massachusetts.

13.     Defendant Frederick N. Zeytoonjian ("Zeytoonjian") has been a trustee of CWR since 1999 and a trustee of SNH since 2003.  Zeytoonjian is a Class II trustee of CWR.  He is the founder and Chairman and Chief Executive Officer of Turf Products, LLC, a distributor of lawn care equipment, for over 40 years.  Since joining CWR's and SNH's Boards, Zeytoonjian has earned compensation and stock grants totaling millions of dollars. According to SEC filings, Zeytoonjian owns 19,642.5 shares of CWR and 11,500 shares of SNH.  Zeytoonjian is a citizen of Connecticut.

14.     Defendant Patrick F. Donelan ("Donelan"), a citizen of Massachusetts, served as a trustee of CWR from 1998 through July 18, 2012.  He has also served on the board of TravelCenters of America LLC ("TravelCenters"), an RMR-controlled Company, since 2007. On July 18, 2012, Donelan unexpectedly retired from CWR's Board.

15.     Defendant William A. Lamkin ("Lamkin"), a citizen of California, has been a trustee of CWR since 2006.  Lamkin is a Class III trustee of CWR.  Lamkin also serves on the boards of CWR, HPT, SIR, and Affiliates Insurance Company, another CWR- and RMR-affiliated Company. According to SEC filings, Lamkin owns 10,812.5 shares of CWR common stock, 10,500 shares of HPT, and 2,000 shares of SIR.

16.     Defendant Joseph L. Morea ("Morea"), a citizen of New York, replaced Patrick F. Donelan as a trustee of CWR on July 18, 2012.  Although Morea failed to obtain the requisite shareholder vote for re-election in 2013, the Board has nonetheless re-appointed him to the sole trustee of Class I.  Since 2003 until sometime in 2012, Morea has been the Vice-Chairman, Managing Director, and Head of U.S. Equity markets for RBC Capital, and had previously served as Head of U.S. Investment Banking for Defendant RBC Capital.  RBC Capital is an investment bank and a broker dealer headquartered in New York.  It was the

"Joint Lead Manager" of the dilutive public offering of CWR common shares in March 2013 which is one of the subjects of this suit. RBC Capital and its affiliates have engaged and will continue to engage in investment banking and other commercial dealings with CWR and other RMR-controlled entities. RBC Capital has received and expects to continue receiving fees, and commissions from various offerings initiated by RMR. RBC Capital was also an underwriter in both the SIR initial share offering and the December 2012 additional 7,000,000 share offering for SIR. In addition, affiliates of RBC Capital are lenders under CWR's revolving credit facility and term loan agreements initiated by RMR on behalf of CWR and other entities controlled by RMR, including at least four publicly traded REITs spun-off by the Company. According to SEC filings, Morea owns 4,000 shares of CWR.

17. Defendants B. Portnoy, A. Portnoy, Popeo, Zeytoonjian, Donelan, Lamkin, and Morea are sometimes collectively referred to as the "Individual Defendants."

18. Defendants Morea, Lamkin, Donelan and Popeo all donate to the Immigrant Learning Center ("ILC") a Massachusetts based charity founded by B. Portnoy's wife.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20. This Court has jurisdiction over each Defendant named herein because CWR and RMR are headquartered in this District, and each of the Individual Defendants have sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391. Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District and the principal place of business of both CWR and RMR is in this District.

22.    Plaintiff's action is not collusive for the purposes of conferring jurisdiction upon the Court.

## DERIVATIVE ALLEGATIONS

23.    Plaintiff brings this action pursuant to Rule 23.1 Fed. R. Civ. P. as Trustee of the foundation of Dr. Hila Louise Chashin-Simon a shareholder of CWR for its benefit to hold the Trustees and RMR accountable for the loss and damage to CWR resulting from Defendants' wrongful conduct to remedy the wrongful conduct, to rescind certain Trustee actions and CWR transactions; to obtain compensatory damages and for declaratory relief.

24.    Plaintiff has made a demand upon the Board to take action to protect CWR's interests. The demand has constructively been refused. Notwithstanding the demand, Plaintiff has not conceded that any Board members are independent, disinterested or capable of making an objective judgment on whether to take action against RMR or any other Defendant Trustees.

## FACTUAL BACKGROUND

**A.    CWR Operates With Irreconcilable Conflicts Between/Among Its Trustees And RMR Which Have Led To Injuries To Shareholders Described Herein**

25.    The Company is a REIT which enjoys tax-exempt status as long as it meets certain IRS requirements including IRS Code 856(a)(1)(2) and (3)(4) and (5). The Company primarily owns office and industrial buildings located throughout the United States in suburban areas and central business districts of major metropolitan markets. CWR is the owner of approximately 440 parcels of real estate including office and industrial rental properties. Its assets are valued at $7.8 billion at cost but their market value is much higher.

26.     Since its formation in 1986, CWR has had no employees.   CWR business is conducted pursuant to fee-based agreements with RMR.   The Board has no employee corporate officers subject to Board control to rely upon to ensure that Company business is being carried out solely for the best interests of the Company and in good faith.   As a result, CWR's Board has no ability to effectively oversee and hold accountable to the fiduciary standards the people who "manage" CWR as in other companies where management serves at the pleasure of, and reports directly to, a board of directors or trustees.   Accordingly, the Board although required to, has failed and has no ability to exercise direct, daily oversight and supervision of CWR or RMR.

27.     The conflicts are as obvious as they are inevitable.   Yet, the Board of CWR has not even taken the most basic steps to ameliorate conflicts or protect CWR from the consequences of such conflicts.   CWR's Board consists of five members, three of whom have financial interests, and/or owe fiduciary duties to RMR and/or the Portnoys (or other entities). Moreover to the extent the Board relies on any advice provided by Sullivan & Worcester, such advice is unreliable because of conflicts arising out of that law firm's concurrent representation of the "Spin-Offs" identified herein of RMR.

28.     Furthermore, although the five-member CWR Board purports to be comprised of two inside trustees (B. Portnoy and A. Portnoy) and three "outside" trustees who are purportedly "independent," two of the three purported "independent" trustees (Larkin and Zeytoonjian) are directly affiliated with entities also managed and controlled by RMR and the third purported "independent" trustee (Defendant Morea) was, until 2012, Vice Chairman, Head of RBC U.S. Equity Capital Markets at Defendant RBC Capital, one of the co-managers for the Equity Offering (defined below).

29.     RMR is an entity that is 100% owned by the Portnoys.  B. Portnoy is CWR's Founder, and A. Portnoy is CWR's President and one of the Principal Executive Officers. Defendant Popeo serves as CWR's long-time Treasurer, Chief Financial Officer, and Assistant Secretary.  The Portnoys and Popeo also serve as Executive Officers of RMR:  Defendant B. Portnoy is RMR's Chairman and Founder; Defendant A. Portnoy is RMR's President, Chief Executive Officer, and Director; and Defendant Popeo is RMR's Treasurer and Executive Vice President.  These persons, despite being "employees" of RMR, owe fiduciary duties to CWR.

30.     The Portnoys also serve as fiduciaries to CWR as its Managing Trustees, comprising two out of the five current members of CWR's Board.  The remaining three Trustees – Lamkin, Zeytoonjian and Morea – are longtime friends and/or business partners of the Portnoys, RMR, and their affiliates, and/or they serve as Trustees on other Portnoy and RMR founded and controlled REITs.  They also sit on the board of, and/or are key donors, to a Portnoy-founded charity.

31.     Since 2009, Defendants have transferred assets from CWR to other spin-off entities.  In 2009, the Insider Defendants created a new entity which they controlled, Government Properties Income Trust, and transferred CWR's best performing properties to it without business justification and for the benefit of the Insider Defendants.  Then in 2012, the Insider Defendants created a new entity which they controlled, Select Income REIT, and transferred 251 of CWR's net leased lands in Hawaii and single tenant properties.

32.     The GOV and SIR spin-off followed the model of other property spin-offs engaged in by CWR in the 1990s.  In 1995, CWR transferred 21 profitable hotel properties to an entity controlled by the Insider Defendants, Hospitality Property Trust.   In 1999, CWR

transferred 93 senior housing projects to an entity controlled by the Insider Defendants, called Senior Housing Properties Trust.

33.     None of the spin-offs have any employees to maintain the properties or run the spin-offs.  Like CWR, all of the spin-offs have management agreements with RMR, owed 100% by the Portnoy Defendants.

34.     The spin-offs provided CWR with capital which it used to purchase new properties.  This allowed RMR to avoid experiencing a reduction in management fees from CWR but increased RMR's overall revenue as the spin-offs became new sources of management fees to RMR and indirectly the Portnoys.

35.     In 2008, CWR earned total revenues of $861,147,000.00 and generated $155,072,000.00 of Cash Available for Distribution.  As a result of the spin-offs, CWR's asset base and revenue generating and CAD generating ability was negatively impacted.  In 2011 CWR generated total revenue of $919,054,000.00 but its CAD fell to $111,845,000.00.

**B.     Defendants Have Continuously Acted To Entrench Themselves In Their Offices To Maintain Control And Perpetuate Self-Dealing And To Evade Accountability**

36.     The institutionalized conflicts of interest described above are further exacerbated by Defendants' adoption of corporate governance measures that are designed to entrench management and insulate Defendants from shareholder scrutiny.

37.     In 2009, 2012, and 2013, the Board adopted certain ownership restrictions into the Company bylaws which eviscerate a shareholder's right to remove and replace the Board.

38.     Under Maryland REIT law, a Declaration of Trust governs and any amendment to a Declaration of Trust must be approved by the majority of shareholders and trumps Bylaws where they are in conflict with the express language of the Declaration of Trust.  *See* MD. CODE ANN., Corps. & Assns. § 8-301(11).

39.     In February 2009, the Board unilaterally amended the Bylaws to require that a shareholder seeking to remove existing trustees and nominate new trustees must have held at least $2,000 in market value, or 1%, of CWR's common shares for at least one year.

40.     On January 10, 2012, CWR's Board unilaterally amended Section 3.14 of its Bylaws to add a requirement that, before any CWR shareholder could seek to proceed to nominate a trustee by written consent, it had to own at least 3% of CWR stock for at least the past three consecutive years ("3%-3-year ownership rule").   This unilateral amendment contradicts CWR's Declaration of Trust and is void as a matter of law.

41.     On March 1, 2013, after the Corvex-Related Group (defined below) indicated its intent to initiate a written solicitation to have the Trustees ousted, the Board hastily amended the bylaws *once again* to purportedly "clarify" that the 3%-3-year ownership rule also applied to anyone seeking to *remove* a trustee by written consent.   Prior to March 1, 2013, there were no more than *two* shareholders who had a reported holding of 3% or more of CWR's common stock for three or more years.   Thus, the 3%/3-year ownership rule, which previously applied only to the nomination of a new trustee by a shareholder, now also applied to shareholders seeking to remove trustees.

42.     The Bylaw amendments of 2009, 2012, and 2013 contradict the plain language and meaning of the Company's corporate charter which provides that "[a] Trustee may be _removed at any time_ with or without cause by vote or consent of holders of Shares representing two-thirds of the total votes authorized to be cast by Shares then outstanding and entitled to vote thereon ...."  *See* Third Amendment and Restatement of Declaration of Trust, dated June 30, 2010 (emphasis added).

43.     CWR's Trustees may only "[m]ake and alter bylaws not inconsistent with law or with its declaration of trust." MD. CODE ANN., Corps. & Assns. § 8-301(11).  CWR's Declaration of Trust similarly limits the bylaws that may be adopted to those "not inconsistent with law or with this Declaration." Declaration of Trust, at § 3.3.

44.     The Board never sought or obtained approval from the majority of shareholders to amend the Declaration of Trust to permit this 3%-3-year ownership rule, or its previous iterations.  Thus, the Bylaw amendments from 2009, 2012 and 2013 are invalid, void and unenforceable by the Defendants who, through these bylaw amendments and the highly dilutive Equity Offering, seek to entrench themselves at the expense of the Company's assets and shareholder rights.

45.     CWR has a classified board, which staggers the election of trustees across several annual shareholder meetings, requiring a term of years to remove incumbent Trustees.

46.     CWR has also adopted a "poison pill" that is triggered by the acquisition of a mere 10% of CWR's outstanding shares.  And this pill is accompanied by a "slow hand" provision that prevents redemptions by a successor Board for 180 days.

**C.      To Protect Themselves From Accountability, The Trustees Have Approved Ultra-Vires The Arbitration Clause**

47.     On December 11, 2008, the Delaware Chancery Court issued an opinion rejecting the efforts of Defendants B. Portnoy and Donelan to have a self-dealing and breach of fiduciary duty action against them (and another CWR spinoff Hotel Property Trust REIT ("HPT")) dismissed.  *See* Exhibit A.  The Chancery Court held that allegations of self-dealing between and among Portnoy, HPT and another Portnoy/RMR controlled entity, Travel Centers of America, LLC brought by cheated shareholders of Travel Centers of America, LLC could proceed.  As is the case here, both HPT and Travel Centers are managed by RMR.  Similar to the circumstances

here, Travel Centers was spun off from HPT.   Also similar to circumstances here, are the

Portnoys' and RMR's actions to benefit themselves, through the spinoffs, to the detriment of the

Company from which the spinoff occurred.   In the Travel Center case, the alleged fiduciary

breach was the Travel Center's directors' approval of a transaction which was designed to, and

did, benefit Portnoy and RMR at the expense of Travel Center.   *Id*. at 5.   In evaluating the Travel

Center shareholder's derivative claim, the Chancery Court held:

> The complaint sets forth sufficient factual allegations to show, at
> this preliminary stage, that Portnoy's loyalties to the Company
> were divided with respect to the Petro Lease Transaction.   As I
> have explained, the duty of good faith requires that Portnoy act
> with a good faith belief that his actions are in the best interests of
> TA.   Portnoy, as a director of HPT and TA, is therefore bound to
> act in the best interest of both companies.   Thus, when Portnoy
> acted on behalf of TA in approving the transaction, his loyalties as
> an HPT director raise at least a reasonable doubt as to whether he
> was acting in the best interest of TA.   Additionally, Portnoy's
> interest in RMR means that Portnoy stands to benefit personally
> from the transaction if TA is bound to pay above market rents to
> HPT.   As explained above, Plaintiff has alleged that payments to
> HPT filter through to RMR (and Portnoy) through agreements
> between RMR and HPT.   Intentionally acting to benefit oneself at
> the expense of the Company is a quintessential example of failing
> to act in good faith, which requires a director to act with the good
> faith belief that his actions are in the best interest of the Company.
> Plaintiff's well pleaded factual allegations, which support the
> allegation that Portnoy used the Petro Lease Transaction to benefit
> himself at the expense of the Company, are sufficient allegations
> of bad faith to survive a motion to dismiss.   [Footnote omitted]

48.    The Portnoys and RMR realized, upon receiving the Chancery Court's decision,

that their conflict-laden management and governance structure would make them forever

accountable to shareholders in judicial forums through shareholder derivative suits where the

shareholders' lawyers could secure adequate compensation for their services against the Portnoys

and RMR.

49.     The Portnoys and RMR acted swiftly to devise a means to evade such accountability.  Thus, several months after the Chancery Court decision, the Portnoys and RMR caused CWR to adopt the arbitration provisions which are the subject of this suit.

50.     In 2009, CWR amended its Bylaws and agreements to contain a provision (the "Arbitration Clause") that purports to require arbitration to all shareholder disputes.  The Arbitration Clause states, in relevant part, as follows:

Section 16.1.  Procedures for Arbitration of Disputes.

Any disputes, claims or controversies brought by or on behalf of any shareholder of the Trust (which, for purposes of this ARTICLE XVI, shall mean any shareholder of record or any beneficial owner of shares of the Trust, or any former shareholder of record or beneficial owner of shares of the Trust), either on his, her or its own behalf, on behalf of the Trust or on behalf of any series or class of shares of the Trust or shareholders of the Trust against the Trust or any Trustee, officer, manager (including Reit Management & Research LLC or its successor), agent or employee of the Trust, including disputes, claims or controversies relating to the meaning, interpretation, effect, validity, performance or enforcement of the Declaration of Trust or these Bylaws (all of which are referred to as "Disputes") or relating in any way to such a Dispute or Disputes shall, on the demand of any party to such Dispute, be resolved through binding and final arbitration in accordance with the Commercial Arbitration Rules (the "Rules") of the American Arbitration Association ("AAA") then in effect, except as those Rules may be modified in this ARTICLE XVI.  For the avoidance of doubt, and not as a limitation, Disputes are intended to include derivative actions against Trustees, officers or managers of the Trust and class actions by shareholders against those individuals or entities and the Trust.  For the avoidance of doubt, a Dispute shall include a Dispute made derivatively on behalf of one party against another party. * * * [E]ach party involved in a Dispute shall bear its own costs and expenses (including attorneys' fees), and the arbitrators shall not render an award that would include shifting of any such costs or expenses (including attorneys' fees) or, in a derivative case or class action, award any portion of the Trust's award to the claimant or the claimant's attorneys.  Each party (or, if there are more than two parties to the Dispute, all claimants, on the one hand, and all respondents, on the other hand, respectively) shall bear the costs and expenses of its (or their) selected arbitrator and the parties (or, if there are more than two parties to the Dispute, all claimants, on the one hand, and all respondents, on the other hand) shall equally bear the costs and expenses of the third appointed arbitrator.

51.     Defendants have also purported to foreclose shareholder derivative suits targeting their misconduct by including the same offensive Arbitration Clause in the BMA, and the PMA, and in amendments to these agreements.  Defendants have included similar arbitration clauses in the transaction agreements governing the GOV and SIR Spin-offs but differ only in that they seek to have Massachusetts law apply to the disputes.

52.     Thus, Defendants breached their fiduciary duties of care, loyalty, and good faith and fair dealing owed to the Company and its shareholders by adopting an offensive arbitration clause in each of the above agreements.  The Portnoys and RMR controlled the content of the Management Agreements and Spin-off Agreements, and knowingly engaged in self-dealing to the detriment of CWR when it inserted the Arbitration Clauses that attempt to foreclose meritorious shareholder derivative suits that would seek to remedy harms inflicted on the Company by its Trustees, officers, and fiduciaries.

53.     With the adoption of the Arbitration Clause, Defendants seek to quash any realistic effort by shareholders to seek recompense for CWR on account of substantial damages caused to CWR as a result of Defendants' breaches of fiduciary duty.  Such self-motivated misconduct has harmed CWR and its shareholders because it effectively obstructs shareholders from seeking to stop corporate mismanagement or hold their fiduciaries accountable.  Indeed, in CWR's 2011 Form 10-K, Defendants admit that:

> [O]ur bylaws provide that actions by our shareholders against us or against our trustees and officers may be referred to binding arbitration proceedings. . . .  In addition, the ability to collect attorneys' fees or other damages may be limited in the arbitration proceedings, which may discourage attorneys from agreeing to represent parties wishing to commence such a proceeding.

The Form 10-K represents that the ability of shareholders' counsel to collect fees if successful "may be limited" but, in fact, the Arbitration Clause goes further: it flatly prohibits any payment

of fees or expenses to the shareholders' counsel, thereby making a derivative action a practical impossibility.

54.     The Board sought to obstruct a fundamental, statutory shareholder right to bring derivative claims in a court of proper jurisdiction to shield itself from liability and clear an even wider path for similar misconduct like the transaction involving SIR in 2012.  *See* MD. CODE ANN., Corporations & Associations § 8-601.1 (referring to § 2-405.1(g)).

55.     The insertion of the Arbitration Clause into the Bylaw and agreements was initiated, timed, structured, and approved to benefit Defendants at the expense of CWR and its shareholders.

56.     Defendants have breached their fiduciary duties of loyalty, care, and good faith and fair dealing owed to the Company and its shareholders by adopting the oppressive Arbitration Clause.  Thus, as a matter of law and equity, the Arbitration Clause should be deemed invalid and unenforceable.

57.     Moreover, the Arbitration Clause should also be deemed unenforceable because CWR shareholders did not contract for or ratify its inclusion in CWR's Bylaws; there was no mutual assent to arbitration as the parties' choice of forum, and thus there is no contractual right to arbitration.

**D.     The Property and Management Agreements Approved By The Trustees Have Allowed The Portnoys To Profit At The Expense Of CWR**

58.     The relationship between CWR and RMR is governed by two agreements:  the Business Management Agreement ("BMA") and the Property Management Agreement ("PMA").

59.     Under the BMA, RMR is required to use its best efforts to manage the Company consistently with its real estate investment policies and objectives.  The BMA contains a

provision that not only grants RMR unfettered discretion of the management of the Company's business, but also purports to waive *any* conflict of interest between the Company and RMR. The BMA compensates RMR by various management fees based on historical costs and by an annual 15% incentive fee based primarily on the market value of the Company's stock. The BMA is automatically renewed absent a notice of non-renewal.

60.     Despite existing fiduciary obligations owed to CWR, the BMA purports to give RMR unfettered discretion to purse its business:

> Nothing herein shall prevent the Manger from engaging in other activities or businesses or from acting as the Manager to any other person or entity (including other real estate investment trusts) even through such person or entity has investment polies and objectives similar to those of Company. . . the Manager shall be free from any obligation to present to the Manager . . . In addition, nothing herein shall prevent any shareholder or affiliate of the Manager from engaging in any other business or from rendering services of any kind to any other person or entity (including competitive business activities). The Company acknowledges and agrees that the Manager has certain interests that may be divergent from those of the Company, including, without limitation, the Manager provides certain services to Affiliates Insurance Company. The parties agree that these relationships and interests shall not affect either party's rights and obligations under this Agreement. <u>The parties further agree that whenever any conflicts of interest arise resulting from the relationships and interests described or referred to . . . between or among the Company and the Manager or their respective affiliates, the Manager will act on its own behalf and not on the Company's behalf or (y) between or among the Company and any entity with whom the Manager has a relationship or contract or their respective affiliates, the Manager shall in its sole and absolute discretion, determine on which of those parties" behalf it shall act, and without any resulting liability or obligation under this Agreement as a result of, arising from or relating to any such determination</u>. (Emphasis added.)

61.     In addition, it purports to give RMR the right of first offer with respect to the sale of CWR property:

[I]f the Company or any of its subsidiaries determines to offer, directly or indirectly, for sale or other disposition arrangement (each a "Sale") any real property that, at such time, is of a type within a principal investment focus of another real estate investment trust to which the Manager at such time provides business management or property management services (such other Company, a "RMR Managed Company"), then prior to offering such real property for Sale to any other person, the Company shall provide notice of such proposed Sale to such RMR Managed Company, describing such proposed Sale in sufficient detail (including expected pricing, payment or lease terms, closing date and other material terms) and offering such RMR Managed Company the right to purchase or lease such real property, and shall negotiate in good faith with such RMR Managed Company for such purchase or lease.

62.     RMR is compensated annually with a management fee:

The Manager shall be paid, for the services rendered by it to the Company pursuant to this Agreement, an annual management fee (the "Management Fee").  The Management Fee for each full fiscal year shall equal the sum of (i) seven tenths of one percent (0.7%) of the Annual Average Invested Capital (as defined below) up to $250,000,000, plus (ii) one half of one percent (0.5%) of the Annual Average Invested Capital exceeding $250,000,000, plus (iii) one percent (1.0%) of the Annual Average Foreign Invested Capital.

***

(i) "Annual Average Foreign Invested Capital" of the Company shall mean the average of the aggregate historical cost (calculated as provided below) of the Foreign Assets (as defined below), all before reserves for depreciation, amortization, impairment charges or bad debts or other similar noncash reserves, computed by taking the average of such values at the end of each month during such period; (ii) "Annual Average Invested Capital" of the Company shall mean the average of the aggregate <u>historical cost of the consolidated assets</u> of the Company and its subsidiaries, . . . before reserves for depreciation, amortization, impairment charges or bad debts or other similar noncash reserves. . . . (Emphasis added.)

63.     In addition to earning an annual fee that is based on the aggregate historical costs

of CWR's properties before depreciation, RMR also earns annual incentive fees:

> Manager shall be paid an annual incentive fee (the "Incentive Fee") for each fiscal year of the Company, consisting of a number of shares of the Company's common shares of beneficial interest ("Common Shares") with an aggregate value . . . equal to fifteen percent (15%) of the product of (i) the weighted average Common Shares of the Company outstanding on a fully diluted basis during such fiscal year and (ii) the excess if any of FFO Per Share (as defined below) for such fiscal year over the FFO Per Share for the preceding fiscal year.

64.     The BMA renews each year with minimal, if any, oversight by the Board.  Rather, the BMA:

> shall be automatically renewed for successive one year terms annually thereafter unless notice of non-renewal is given by the Company or the Manager before the end of the term.  It is expected that the terms and conditions may be reviewed by the Independent Trustees of the Compensation Committee of the Board of Trustees of the Company at least annually.

65.     Under the Property Management Agreement ("PMA"), RMR is required to manage the various properties by negotiating leases, collecting rent, supervising and managing construction and repairs, hiring contractors, and securing insurance.  For these services, RMR is paid three (3) percent of all gross rents collected and five (5) percent of total costs of construction.  The PMA is also self-renewing.

66.     CWR pays RMR a fee equal to 3% of gross rents collected and a construction supervision fee of 5% of the total costs of the construction.  CWR also reimburses RMR for certain out-of-pocket costs and expenses.   As with the BMA, the Property Management Agreement covers a one-year term that automatically renews at the end of each year.  The Board allowed the BMA and PMA to renew annually without any meaningful oversight or review.

67.     Notably, the PMA contains a change of control provision that is harmful to CWR and acts to further entrench RMR into the management of CWR.  Specifically, under the terms of the PMA, RMR gave itself the right to abruptly terminate the PMA with only five (5) business

days of notice upon a change of control.  A "change of control" is defined by the PMA as any investor purchasing more than 9.8% of the Company's outstanding common stock.

**E.**     **Under Cover Of The *UltraVires* Bylaw Amendments, Trustees and Officers Of CWR and RMR Have Committed Fiduciary Breaches and Other Wrongful Acts Which Have Damaged CWR and Its Shareholders**

68.     The indisputable infirmities in the management and governance structure have allowed the Portnoys to dominate the Board and cause the Board to approve self-dealing transactions that have indisputably caused loss and damage to CWR and its shareholders.  These are described below.

*1.*     *The Spin-Offs*

69.     The contracts between CWR and RMR appear to overwhelmingly favor RMR at the expense of CWR.  The BMA, to the extent it purports to allow RMR to resolve conflicting interests between it in RMR's favor, illegally eviscerates the fiduciary obligations of the Trustees (*i.e.*, the Portnoys and Popeo) who control RMR and own it.  The provisions in the BMA also improperly restrict the Trustees' ability to maximize the value of CWR properties and operate to unlawfully bind all successor boards of trustees from fulfilling their fiduciary duties.  The compensation structure of the BMA, being based on "Annual Average Invested Capital" based on historical cost of the consolidated assets, operates to compensate RMR on a basis other than performance.  The BMA, like the PMA, is renewed automatically each year unless notice of non-renewal is given.  The incentive fee earned under the BMA is 15% of any annual increase in FFO from the prior year.  The compensation paid under the BMA and PMA appears to be redundant in that it is for similar services.

70.   Without shareholder approval or ratification, the Board implemented a series of Spin-offs, consisting of the movement of properties that were 100% owned by CWR to publicly traded REITs that were newly created and controlled by the Portnoys and managed by RMR:

a.   *The GOV Spin-off.*   In 2009, the Portnoys created GOV and transferred to it CWR's 29 wholly-owned government-leased office properties.   The GOV portfolio of properties was 99% occupied by state and government agencies.

b.   *The SIR Spin-off:*   In 2012, Defendants caused CWR to spin-off a wholly owned subsidiary, SIR, which held 251 properties consisting of net leased lands in Hawaii and single tenant office and industrial properties.   Among other infirmities, the SIR spin-off was timed to maximize its value to the new entity at the expense of CWR. Just months after the SIR spin-off, SIR raised average rents by over 43%.

71.   The GOV and SIR Spin-offs favored RMR materially and CWR not at all.   The formation of a new REIT using only CWR's highly profitable and low-leveraged properties gave the Portnoys and RMR the vehicle to raise new capital by leveraging the properties in the new REIT, thereby enabling them to buy more properties.   The purchase of additional properties resulted in tens of millions of dollars in additional fees from the management contracts RMR had with the new REITs.   Because of CWR's debt-level and the quality of the rest of its portfolio, CWR could not have raised more capital to acquire new properties, or CWR could not have done so to the same extent as the Spin-off REITs were able to do.

72.   The Spin-offs also gave the Portnoys and their affiliates a vehicle to get new compensation (monetary and stock grants), as the Portnoys appointed themselves as the managing trustees of the Spin-off entities, and gave themselves and RMR-employees positions

as executive officers of the Spin-off entities:  A. Portnoy became GOV's President, and Popeo is SIR's Treasurer and Chief Financial Officer.

73.     In complete and utter abdication of its responsibilities in overseeing CWR, and such related-party, self-dealing transactions, CWR's Board did not implement any process to determine whether (or to ensure that) the self-dealing Spin-off transactions were fair or in the best interests of CWR, nor did they demonstrate any reasonable business objective for transferring properties to the Spin-offs, much less maximize shareholder value.  In fact, the consideration that CWR received in each Spin-off – consisting of less than a 100% interest in the Spin-off entity and/or some cash or equivalent consideration – was grossly inadequate and unfair.  The value of the consideration for transferring properties to the Spin-offs paled in comparison to the value of the cash flow CWR received from owning 100% of the properties transferred to GOV and SIR.

74.     The Board apparently allowed the Spin-offs to proceed without the benefit of the procedural safeguards imposed by CWR's Declaration of Trust.  The Declaration of Trust in circumstances such as presented by the Spin-offs allows CWR to enter into contracts with the Portnoys or RMR only if: (i) the latter's interests are disclosed, or known to, the trustees and shareholders; (ii) the transaction is approved by a majority of disinterested trustees or shareholders; and (iii) other procedural requirements.

75.     The Spin-offs negatively impacted CWR's financial condition while providing financial benefits to the Portnoys and RMR.  CWR sold to GOV and SIR its most profitable, high-quality and growth-generating properties.  Consequently, CWR's debt as a percentage of the cost of its properties increased substantially (evidencing the loss of the low-leveraged properties).  In addition, the SIR properties had generated 58% of CWR's cash available for

distribution ("CAD"), even though they accounted for 12% of CWR's portfolio on a total revenue basis.  Upon consummation of the SIR Spin-off, CWR lost significant cash flow.  As a direct result of these lopsided transactions, CWR suffered a significant reduction in CAD, a condition that led inexorably to the slashing of its quarterly dividend.

76.     The negative impact of the Spin-offs is demonstrated by a comparison of the stock performance of CWR to that of SIR and GOV.  From January 2010 through February 14, 2013, CWR's share price declined 12.85%, while GOV's share price increased 35%.  Since the SIR Spin-off, SIR's stock has increased over 22%.  The conveyances of assets for inadequate consideration resulted in a transfer of shareholder wealth from CWR shareholders to the shareholders of SIR and GOV.

77.     The management and operation fees generated by the agreements between RMR and the spun-off REITs have been nothing short of lucrative.  In 2008, RMR's fee income alone for managing and operating these REITS was $76 million.  In 2009, fee income was $85 million.  In 2010, fee income was over $114 million.  In 2012, RMR earned over $135 million in fees from the management and operation of these spun-off REITs.

78.     The conflicted Board, dominated by the Portnoys, also caused CWR to grant GOV and SIR each a right of first refusal to purchase certain CWR properties.  That, of course, allows RMR and the Portnoys and GOV and SIR the ability to usurp CWR corporate opportunities.  The right to first refusal awarded to GOV and SIR was in addition to the right of first refusal granted to RMR by CWR in the BMA which requires CWR to first offer to RMR the right to purchase any CWR property which "is of a type within a principal investment focus of another real estate investment trust to which RMR provides business management or property management services."

2.      *Defendants' Fiduciary Breaches Have Exposed CWR*
        *To Securities Fraud Liability*

79.     To conceal the extent to which the GOV and SIR Spin-offs had impaired CWR, the Board caused CWR to characterize as non-recurring "development and redevelopment activities," regularly recurring expenses.  This manipulation allowed CWR to report a higher CAD and lower dividend payout ratio than actually existed.  The misrepresentation allowed the Board to publicly represent that CWR's dividend level was sustainable.  In fact, as CWR was forced to reveal in mid-2012, it could not afford its then current dividend yield of 10%.  When it was announced CWR was cutting its dividend by 50%, CWR stock dropped by about 20%.  CWR is now a Defendant in a securities class action lawsuit.  The Trustees' improper actions and dereliction of duties have exposed CWR to millions of dollars of liability under the federal securities laws.

3.      *The Board Allowed A Massive Dilution Of Shareholders' Interest*
        *By Orchestrating A Below-Market Secondary Offering To Further Defendant*
        *Trustees' Entrenchment*

80.     In January 2013, two entities with large CWR shareholdings, Corvex Management LP ("Corvex") and Related Fund Management LLC ("Related") (collectively, the "Corvex/Related Group"), acquired, in the aggregate, 9.75% of CWR's outstanding shares.

81.     During the week of February 18, 2013, the average volume per trading day in CWR stock nearly tripled from 680,000 to 1.98 million, signaling the acquisition of a significant block of stock in CWR.

82.     Prior to such activity, in November and December 2012, Luxor Capital Group, LP ("Luxor") had started to acquire a substantial amount of CWR shares.  As discussed *infra*, Luxor also met with representatives of CWR, including Defendants A. Portnoy and Popeo, to discuss CWR and its relationship with RMR and the Portnoys.  By the week of February 18,

2013. Luxor had acquired what at that time was approximately 8% of CWR's outstanding common stock. Such activity was a threat to the Portnoys' and RMR's control of CWR and presented a material risk of an imminent takeover. The Board reacted immediately with a plan for an Equity Offering and Tender Offer that would dilute CWR's shareholders by 40%.

83.      At the time the Board initiated the secondary stock offering on February 25, 2013, the Board members knew that CWR stock was being accumulated by activist investors, one of whom had met with CWR representatives to discuss its concerns and other issues. On February 25, 2013, Board members knew that a credible expression of interest in acquiring all outstanding shares at a significant premium had been communicated to the Company.

84.      Notwithstanding the expression of interest and the soaring market price of CWR shares, the Board approved the pricing of the offering at $19.00, substantially below the then-correct market value that caused massive voting and capital dilution to CWR and its shareholders. It also allowed underwriters to profit from material inside non-public information and realize windfall profits on an approximately four-million-share over-allotment allocation.

85.      In February 2013, the Convex/Related Group indicated to Company management that it had valued the Company far above its market price, and offered to purchase all of the outstanding shares for $27 per share. The Equity Offering was being pursued by the Company to defeat efforts by existing shareholders to effect change at the Company. Significantly, to remove the Trustees by written consent requires a 66.67% vote of the shareholders. By closing the Equity Offering, by massively diluting the existing shareholders and placing large blocks of stock in friendly hands, the Trustees are taking inappropriate steps to disenfranchise the existing shareholders. Such abuse of the markets should not be countenanced.

86.     In response to an offer from Corvex and Related to acquire all outstanding CWR stock for _$27.00_ per share, CWR issued a press release on February 27, 2013 stating that the proposed new stock for the Equity Offering, now totaling 34,500,000 common shares (including the anticipated underwriters' over-allotment option), had been priced at _$19.00_ per share, and that the Equity Offering would close on Tuesday, March 5, 2013. CWR priced the shares in the Equity Offering _at $19.00 per share_, even though CWR stock had been trading for over two days with highs of _over $24.00 per share_ and with significant trading volume of over 60 million shares, demonstrating excess market demand for the common shares at prices well above the $19.00 offering level.

87.     There was no genuine "business purpose" for the economically irrational Equity Offering at all. Rather, as explained herein, the sole purpose of the offering was to dilute the voting power of existing shareholders and entrench management, including through making an action by written consent to replace the Board significantly more difficult to achieve, so that Defendants could continue to exploit CWR in order to line their own pockets. With the Equity Offering, Defendants effectively put in place _and_ _triggered_ a poison pill.

88.     There was no plausible business or economic rationale for the offering. Instead, the sole and undisclosed purpose of the sudden and massive offering of 34,500,000 new shares of CWR common stock – or over 40% of the currently outstanding equity in the Company – was to dilute the voting power of existing shareholders so as to make it dramatically more difficult and onerous, if not impossible, for existing shareholders to remove any of CWR's Trustees.

89.     The Equity Offering was priced at $19.00 per share, well below the closing price of $25.25 per share at which CWR closed the day before, and even further below the $27.00 per

share price at which Plaintiff had offered to buy all outstanding CWR stock.  Defendants, intent on disenfranchising existing shareholders and to entrench themselves further, opted instead to place the below-market-priced shares with buyers.

90.     Following the February 25, 2013 announcement, CWR held investor meetings in New York during which it represented that the primary reason for initiating the Equity Offering was to appease credit rating agencies who had threatened to downgrade the Company.  Given the Company's significant assets, however, it was absurd to suggest that a purported concern about a credit ratings downgrade could only be addressed by a proposal that would massively dilute the holdings of common equity holders.  It would have been more prudent and plausible, as well as far easier, to deliver and prevent a downgrade by effecting asset sales from the Company's existing real estate portfolio or selling a portion of the Company's stake in other publicly traded REITs.  It likewise made no sense for the Company to represent that it needed funds to repurchase notes at a time when the Company was not facing liquidity issues, and the notes at issue were trading well above par, had no near term maturities, had no covenant issues, and contained no ratings triggers.

91.     On information and belief, the Board and underwriters for the Equity Offering shut out anyone who was not deemed a "friendly" investor to the Portnoys.  The Board sold CWR's stock at a substantial discount to help entrench itself and the Portnoys.  Meanwhile, the Board admitted that it failed to obtain the advice of an independent advisor or legal counsel.  The Board engaged in a willful breach of its fiduciary duties when it failed to sell CWR's stock for the highest price, or even market value.

92.     On March 5, 2013, CWR issued a press release announcing that its Equity Offering of 34.5 million common shares had closed and that CWR's net proceeds, after the

underwriting discount, were approximately $627.6 million. Had Defendants sold CWR's stock at the prevailing market price on March 5, 2013 of $23.12, CWR would have raised an additional $170 million of capital. There were even indications that CWR's stock could have sold at $27 per share, raising even additional capital for CWR.

### 4. The GOV and SIR Public Offerings

93.     Thereafter, Defendants caused CWR to proceed with further shareholder and CWR value-destroying events. On March 11, 2013, Defendants announced that CWR was commencing a public offering of its 9,950,000 common shares of GOV, which reflects CWR's *only* remaining interest in the lucrative GOV properties spun-off in 1999. Then, on March 25, 2013, just two weeks later, CWR announced that it would commence a public offering of its 22 million common shares of SIR, divesting itself of its interest in the lucrative SIR properties spun-off in 2012. The sale of CWR's equity interests in GOV and SIR materially impaired CWR's cash flow and its ability to sustain the payment of dividends. Moreover, the sale of the equity interests contradicted Defendants' purported justification for the GOV and SIR spin-offs (that is, to unleash value to enhance CWR's cash flow through its equity interests). It also contradicted Defendants' recent statements about the materiality and importance of such equity interests to CWR.

94.     On Monday, February 25, 2013, following the announcement of the Equity Offering, CWR's common shares closed at $15.85 per share on the NYSE, a 12.1% decline from the Friday, February 22, 2013 closing price.

95.     On February 26, 2013, following the public disclosure of the Corvex/Related Group proposal, CWR's common shares closed at $24.40 per share on the NYSE, a 53.9% increase from the February 25, 2013 closing price.

96.     On March 5, 2013, following the closing of the Exchange Offer, CWR shares closed at $23.20 per share, or a 2.9% decline.

### 5.     *The Dilutive Equity Awards*

97.     As a final insult to CWR, the Board approved increased awards of stock options to themselves under the Equity Compensation Plan.  The increases were completely unwarranted and unearned and diluted CWR equity by increasing the equity award per Board member from $1,335,960 worth of equity options in 2011 to $3,000,000 worth of equity for 2012.

### COUNT I

### BREACH OF FIDUCIARY DUTY:  DILUTION
### CLAIM AGAINST ALL INDIVIDUAL DEFENDANTS

98.     Plaintiff repeats and realleges each and every allegation contained herein as if fully set forth herein.

99.     Specifically, the Individual Defendants were charged with a duty of due care, to act rationally, in good faith and to inform themselves of all material information reasonably available to them in making decisions on behalf of the Company.  The Individual Defendants were further charged with the duty of loyalty, to act in the best interest of the Company, to avoid self-interested transactions in which the Individual Defendants' interests would be placed above the interests of the Company and its shareholders, and, when seeking shareholder approval of a corporate action, to fully and fairly disclose all material facts to shareholders concerning the action for which such approval was sought.

100.    Further, where the interests of the common stockholders of the Company diverged from those of the preferred shareholders, the Individual Defendants were charged with a duty to prefer the interests of the common stock – as the good faith judgment of the Board sees them to be – to the interests created by the special rights and preferences of the preferred stock. At all

times alleged, Plaintiff reposed special trust and confidence in the Individual Defendants in that said Defendants controlled and dominated the management and affairs of the Company.  At all times alleged, a majority of the Individual Defendants were either interested or lacked independence in determining whether to approve the Transactions discussed above.

101.    Selling new stock at a price below the value of the portfolio dilutes value for existing shareholders.   The Equity Offering was not open to all and, indeed, excluded shareholders who had expressed interest in an offer for the entire Company which was substantially higher than the price of the Equity Offering.  The price of the Equity Offering was not adjusted to reflect this new information.

102.    The purpose and effect of these transactions was and is to diminish the relative economic and voting interests of any person or entity who wished to challenge the domination that the Defendants held over CWR at the expense of the minority shareholders, and to deter an actual or potential takeover threat by ensuring that the additional equity fell into friendly hands, including underwriters, one of whom, Defendant RBC Capital, had a representative on the Board.

103.    The Individual Defendants and their selected shareholders acquired 34.5 million new shares. The relative ownership of the potential bidding group fell by from approximately 9.75% to approximately 8.57%.  Indeed, as a result of the offering, shareholders' pre-offering position was diluted approximately 41%, thus reducing their voting power to the extent they were unsuccessful in obtaining any shares in the offering.

104.    Moreover, the Equity Offering was accomplished at below-market rates, giving the Individual Defendants, their underwriters, and their allies an additional windfall at the expense of the remaining shareholders.

105.    The Equity Offering was accomplished rapidly and discriminatorily.   Although "public" in name, a mere five business days were allowed to respond to the Equity Offering, and most shareholders were unable to participate.

106.    The break-neck decision to effectively exclude the vast majority of shareholders from the below-market priced Equity Offering defies any explanation other than the desire to retain control over the lucrative management and property agreements which RMR has over CWR and its related REITs.   The potential bidder indicted that it had estimated the net asset value of the Company between $40 and $55 per common share – or over *double* the trading price – and a willingness to conduct a deal at $27 per share, well over the then-current market price.

107.    To ensure control over CWR and its impressive stream of fees and access to properties that can fuel its 100%-owned REITs, Defendants caused unfairly low-priced CWR shares to be offered, totaling approximately 41% of the outstanding equity of the Company, to friendly entities, with virtually no public notice, without consent of the minority shareholders, and without an opportunity for them to participate on similar terms.

108.    The Defendants ignored – or failed to even consider – an independent valuation by the Corvex/Related Group which valued the Company up to $40 per share, and unfairly and rapidly rejected a proposal under which the Corvex/Related Group would have acquired the Company for $27 per share.

109.    Faced with sharply curtailed dividends and growing shareholder dissent, the Individual Defendants planned the Equity Offering and Debt Tender Offer as a means of entrenching themselves into lucrative fees and property opportunities, all of which substantially harmed the minority shareholders by diluting their holdings at the direct expense of the Individual Defendants' ambitions.

110.     The Individual Defendants completely dominated the Company.  As a group, they exercised complete and effective control over the Company and caused the enactment of their plan to have the Company issue excessive shares of stock in a virtually private deal to fend off actual and potential suitors, which had the effect of substantially diluting and thus harming the minority shareholders.

## COUNT II

### BREACH OF FIDUCIARY DUTY AGAINST ALL THE INDIVIDUAL DEFENDANTS:  DISENFRANCHISING SHAREHOLDERS THROUGH THE ARBITRATION CLAUSE, BYLAW AMENDMENTS. AND BMA AND PMA AGREEMENTS

111.     Plaintiff repeats and realleges each and every allegation contained herein as if fully set forth herein.

112.     The acts and transactions of the Board as detailed herein have disenfranchised shareholders.

113.     The Arbitration Clause in the Bylaws insulates trustees, officers, and RMR from accountability to CWR and its shareholders.

114.     Starting in July 2009, the Portnoys and CWR's Board unilaterally inserted binding arbitration clauses into CWR's Bylaws and into agreements entered into between, or involving, CWR and RMR ("Arbitration Clause").   The improper nature of the Arbitration Clause is multifaceted.   It was initiated and executed by conflicted participants.   More importantly, it unlawfully insulates the CWR Board, CWR officers, and RMR for accountability for wrongdoing.   Maryland law, not the Bylaws or the management agreements, provides the parameters of Trustee liability and accountability and may not be reduced or eliminated by agreement or bylaw amendment or charter.   The Arbitration Clause, in effect, vitiates any shareholder rights to vindicate rights of the Company or otherwise.   To that extent, the

Arbitration Clause may be *ultra vires*, illegal or at the very least a breach of the CWR Board's breach of fiduciary duty to protect CWR.

115.    The Board members apparently allowed the Spin-offs to proceed without the benefit of the procedural safeguards imposed by CWR's Declaration of Trust.  The Declaration of Trust in circumstances such as presented by the Spin-offs allows CWR to enter into contracts with the Portnoys or RMR only if (i) the latter's interests are disclosed, or known to, the trustees and shareholders; (ii) the transaction is approved by a majority of disinterested trustees or shareholders; and (iii) other procedural requirements.

116.    The Individual Defendants have secured, or are controlled by Defendants who have lucrative positions in the Company by virtue of management and property agreements with RMR, an entity they completely control.

117.    The below-market Equity Offering permitted the Individual Defendants to dilute the shareholdings of any challenger to their lucrative positions, thus making it difficult if not impossible to dislodge the Individual Defendants from their lucrative positions.

118.    To achieve this additional layer of assurance, the Individual Defendants caused the Company to issue 40 percent more shares at a below-market price, even though they were approached with a proposal from a third party to acquire the Company at a substantial premium, a proposal that would have benefitted all shareholders.

## COUNT III

### BREACH OF DUTY OF LOYALTY AND SELF-DEALING
### AGAINST B. PORTNOY, A. PORTNOY AND RMR

119.    Plaintiff repeats and realleges each and every allegation contained herein as if fully set forth herein.

120.     Defendants B. Portnoy, A Portnoy and RMR through their dominance of CWR, caused CWR to enter into the SIR and GOV spin-offs.

121.     These spin-offs were not arms- length transactions and were protected by these Defendants' desire to increase revenues to RMR at the expense of CWR.

122.     The spin-off transactions were contrary to CWR's best interests for the reasons set forth herein and caused loss and damage to CWR.

123.     The spin-off transactions constituted self-dealing by the Defendants named in this count because the Defendants were on both sides of the negotiating table and controlled both sides.

124.     The self-dealing spin-offs implicated the entire fairness standard which thus requires Defendants to establish "fair price" and the product of "fair dealing" in connection with the spin-off and related transactions.

125.     The spin-offs did not occur at a "fair price" for CWR and were not executed through fair dealing inasmuch as there was no special committee of Trustees, nor any independent financial or legal advisors retained for the benefit of CWR nor were alternatives analyzed or considered.  Moreover, the transactions were initiated, negotiated and structured to unfairly benefit the Defendants.

126.     Accordingly, the Defendants named herein breached their fiduciary duties.

## COUNT IV

### BREACH OF DUTY OF LOYALTY
### AGAINST ALL DEFENDANTS FOR ENTRENCHMENT

127.    Plaintiff repeats and realleges each and every allegation contained herein as if fully set forth herein.

128.    In implementing the Dilutive Stock Offering and the Bylaw Disenfranchising Amendments, the Trustees' sole or primary purpose was to perpetrate the Trustees' control of CWR in order to preserve and extend the self-dealing related party transactions described herein.

129.    The Defendants on the Board knew and understood that there was an actual threat to their continued Board membership and control of CWR.

130.    Defendants' actions were designed entirely, and had no other effect than, to preclude any challenge to Defendants' control of CWR.

131.    Defendants' actions must be reviewed under the standard of enhanced scrutiny pursuant to which the Individual Defendants herein must discharge their burden to show that proper corporate objectives were served by their actions and that their actions were reasonable in relation to their objectives.

132.    None of Defendants' actions which are the subject of this cause of action were part of a good faith plan to promote stockholder value.

133.    As a result of the foregoing, recission of all of the foregoing corporate actions is the appropriate remedy.

## COUNT V

### FOR BREACH OF DUTY OF LOYALTY AGAINST THE INDIVIDUAL DEFENDANTS FOR AWARDING THEMSELVES EXCESSIVE COMPENSATION THROUGH THE INCREASE IN EQUITY OPTION AWARDS IN 2012

134.    Plaintiff repeats and realleges each and every allegation contained herein as if fully set forth herein.

135.    The increase in director equity option awards from 1.2 million per director to 3 million per director in 2012 were the result of "directorial self-compensation" decisions.

136.    In such circumstances, the directors' receipt of their self-determined benefits must be reversed and rescinded because the Board members cannot make the requisite showing that the increase is fair to CWR.

137.    In the circumstances herein, there were no services provided to CWR which could justify the increase in compensation to the Board members.

138.    Accordingly, the increase in compensation to the Board Members must be rescinded and the awards returned to CWR.

## COUNT VI

### BREACH OF FIDUCIARY DUTY OF LOYALTY AND CANDOR AGAINST ALL DEFENDANTS FOR ISSUING MATERIALLY FALSE AND MISLEADING FINANCIAL AND OTHER STATEMENTS

139.    Plaintiff repeats and realleges each and every allegation contained herein as if fully set forth herein.

140.    Defendants knowingly caused CWR to issue false and misleading statements about the sustainability of CWR's dividends and knowingly caused CWR to inflate CAD by knowingly misclassifying recurring expenses as capital investments to properties which did not reduce CAD.

141.    As a result of such knowing breach of the duty of candor, Defendants caused CWR to be in violation of various securities laws.

142.    CWR's alleged violations of securities laws are the subject of a shareholder class action which threatens to cause material financial loss and damage to CWR.

143.    Defendants' fiduciary breaches enumerated herein are the cause of loss and damage to CWR for which Defendants are liable to CWR.

**COUNT VII**

**AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS
FOR SALE OF EQUITY AT UNFAIRLY LOW PRICES
TO PRESERVE THEIR CONTROL AND ENTRENCH THEMSELVES**

144.    Plaintiff repeats and realleges each and every allegation contained herein as if fully set forth herein.

145.    The February 2013 Equity offering was made for an improper purpose and for unfair consideration.

146.    The Equity Offering served no corporate purpose.

147.    The Equity Offering was manipulated to provide management friendly shareholders with an opportunity for windfall profits in exchange for support of management and RMR's self-dealing agenda.

148.    The Equity Offering therefore constitutes a waste of corporate assets which has caused loss and damage to CWR.

149.    The waste alleged herein was caused by Defendants' actions in approving the Equity Offering at unfair prices.

150.    As a result Defendants are liable to CWR for all loss suffered by CWR.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.     Declare that Defendants have violated their fiduciary duties by improperly diluting the equity of the public shareholders;

B.     Declare as unenforceable the Arbitration Clauses in the Bylaws and agreements;

C.     Impose a constructive trust over Defendants' shares obtained in the Equity Offering;

D.     Award damages in an amount to be determined at trial, or in the alternative, imposing a constructive trust, in favor of CWR, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

Dated: October 3, 2013

/s/ David Pastor_____
David Pastor (BBO#391000)
dpastor@pastorlawoffice.com
PASTOR LAW OFFICE, LLP
63 Atlantic Avenue, 3rd Floor
Boston, Massachusetts 02110
Telephone:  (617) 742-9700
Facsimile:  (617) 742-9701

SQUITIERI & FEARON LLP
Olimpio Squitieri
lee@sfclasslaw.com
32 East 57th Street
12th Floor
New York, New York 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553

HARWOOD FEFFER LLP
Robert I. Harwood
rharwood@hfesq.com
James G. Flynn
jflynn@hfesq.com
488 Madison Avenue, 8th Floor
New York, New York 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630